UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

EXXON MOBIL CORPORATION,

      Plaintiff,

  v.

NEW WEST PETROLEUM L.P., NEW
WEST PETROLEUM, LLC, NEW WEST
PETROLEUM, NEW WEST STATIONS,
INC. and NEW WEST LLC

      Defendants.

----------------------------

AND RELATED THIRD-PARTY
CLAIMS, CROSS-CLAIMS AND
COUNTERCLAIMS

NO. CIV. S-03-2222 WBS PAN

MEMORANDUM AND ORDER
RE: CROSS-MOTIONS FOR SUMMARY
JUDGMENT, MOTIONS TO AMEND
PLEADINGS, MOTION FOR
SANCTIONS, MOTIONS IN LIMINE
TO EXCLUDE EVIDENCE

----oo0oo----

      This litigation concerns which party is contractually responsible for paying the costs of cleaning up pollution at 3430 Northgate Boulevard in Sacramento ("the Property").  Federal jurisdiction is based on diversity of citizenship (28 U.S.C. § 1332).  There are several motions before the court:

•   Motion for leave to file a first amended answer by New West

1

Petroleum, L.P., New West Petroleum LLC, New West Petroleum, and New West Stations, Inc. (collectively, "New West")[1]

- New West's motion for summary judgment on plaintiff's claims on the basis that New West's contractual performance is excused due to plaintiff's alleged breach of warranty
- Motion for summary judgment made by New West Stations, Inc. ("NWS") and New West Petroleum[2] ("NWP") on the basis that these defendants were not parties to either the purchase and sale agreement or the lease assignment that form the bases for this suit
- New West's motion for summary judgment on all of the claims of cross plaintiff Sartaj Singh Bains
- Plaintiff ExxonMobil's ("Exxon") motion for summary judgment as to Exxon's breach of contract claim against New West
- Bains' motion for leave to file an amended answer to New West's claims against him and for leave to file amended counterclaims against New West
- Exxon's motion to strike defendants' evidence in support of defendants' motions for summary judgment
- Exxon's motion for sanctions under Federal Rule of Civil Procedure 26 ("Rule 26")
- Daubert motions made by Exxon and New West
- Exxon's motion in limine to exclude the testimony of Hans Herb

---

[1]     New West LLC was dismissed early on in this case.

[2]     Although originally listed in the caption as "New West Petroleum, Inc.," defendants now assert that there is no "Inc." in New West Petroleum's official name.

I. Factual and Procedural History

On May 11, 1987, lessor Robert Fong and lessee Landwick Properties entered into a ground lease for the Property.  (Wong Decl. Ex. A (ground lease)).[3]  In December 1988, Landwick Properties assigned its interest in the lease to REASL, Inc., which then assigned the same interest to Philadelphia National Bank ("PNB").  (Wong Decl. Ex. E (assignments of lease)).  Also in December 1988, PNB assigned that interest in the Property to Exxon Corporation.[4]  (Id.).  In 1991 Exxon built a gasoline station on the Property (the "gas station"). (Pl.'s Statement of Undisputed Facts ("SUF") in Supp. Pl.'s Mot. for Summ. J. ¶ 1).

On September 29, 1998, Exxon assigned its interest in the lease to New West Petroleum L.P. ("NWP LP").  (Wong Decl. Ex. F (Exxon-New West assignment)).

---

[3]   Exxon moves this court to strike the declarations of Edward Wong, Spencer Malysiak, and J. Gilbert Moore submitted in connection with New West's motions for summary judgment.  Exxon notes that the last day to file dispositive motions was Friday, April 15, 2005, and these supporting documents were filed April 18, 2005.  Exxon has not demonstrated that it would suffer any prejudice from the court's consideration of these documents.  Although New West's late filing of supporting documents should not be encouraged, if the court were to take the extreme measure of striking them from the record, the court's truth-seeking function would be impaired.  The court has an interest in deciding cases on the merits rather than on technicalities.  Olvera v. Giurbino, 371 F.3d 569, 573 (9th Cir. 2004).
The same rationale applies to defendants' attorney Malysiak's unintentional violation of Local Rule 5-133(j) by his failure to timely file the relevant excerpts of deposition testimony. On April 15, 2005, Malysiak submitted an electronic copy of the entire depositions to the undersigned's e-mail address and also sent a copy of those transcripts to plaintiff.  Plaintiff moves to strike any references to depositions in defendants' papers.  To strike this supporting evidence would also be against the court's interest as stated in Olvera.  Furthermore, Malysiak has cured his error by filing the relevant portions of the depositions with the court.

[4]   Exxon was then known as "Exxon Company, USA."

1          On July 6, 1998, prior to the assignment of the lease

2    from Exxon to NWP LP, Exxon and NWP entered into a purchase and

3    sale agreement for the Exxon gasoline station then located on the

4    Property.  (Miguel Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex.

5    3).  The third amendment to the purchase and sale agreement,

6    agreed to on September 10, 1998, shows that the purchaser of the

7    gas station is NWP LP, not NWP.  (Moore Decl. in Supp. of Mot.

8    for Summ. J. Ex. B).  The bill of sale between NWP LP and Exxon

9    was executed September 10, 1998.  (Id. Ex. E).  Escrow closed

10   September 29, 1998.  (Statement of Defs.' Counsel at Oral

11   Argument).

12         An initial subsurface investigation report was

13   completed by Delta Environmental Consultants (the "Delta report")

14   on June 26, 1998.  (Miguel Decl. in Supp. of Pl.'s Mot. for Summ.

15   J. Ex. 10 (Delta report)).  Delta bored into the soil to a depth

16   of forty feet beneath the surface, and collected soil samples at

17   intervals of five feet.  (Id. at 4).  The report stated that

18   methyl tertiary butyl ether ("MTBE") was found in the soil at

19   concentrations ranging from 280 mg/kg to 7,800 mg/kg.  (Id. at

20   6).  Delta also monitored ground water, which was found 28.42 to

21   27.61 feet below the surface.  (Id. at 5).  Delta reported MTBE

22   in the groundwater at well MW-1 at 2,800 micrograms/liter (μg/L).

23   (Id.).

24         In the purchase and sale agreement executed by NWP and

25   Exxon, Exxon agreed to "undertake such remediation of the

26   Baseline Condition at [the] Property as is required under

27   applicable laws, regulations, or government orders."  (Miguel

28   Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. 3 ¶ 12).  However,

4

the purchase and sale agreement also states that Exxon is not responsible for remediating any release or discharge of petroleum hydrocarbons occurring after the closing date of the sale.  (Id. ¶ 12(d)).  Under the agreement, if contamination occurs after the closing date, Exxon has two options: it may clean up the new contamination and bill NWP or it may discontinue its remediation efforts until the new contamination has been remediated by NWP. (Id. ¶ 12(e)(i)).  The agreement also requires NWP to maintain, at NWP's expense, $1,000,000 in environmental impairment insurance coverage.  (Id. ¶ 20(a)).

Exxon's expert claims that the amount of MTBE in the soil and groundwater increased by an order of magnitude from 1998 to 2002.[5]  At a well location labeled MW-1, the level of MTBE in the groundwater was measured at 2,300 µg/L in December 1998, 3,200 µg/L in January 1999, and 18,000 µg/L in May 2001.  In April 2002, the MTBE levels were measured at 37,300 µg/L.  Those levels decreased to 16,000 µg/L in April 2004. (Miguel Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. 7 (ETIC expert report) Table 2)).[6]

The parties do not make it clear at what point Exxon began cleansing the Property of petroleum hydrocarbons, nor do the parties make it clear the method by which this cleansing has

---

[5]    Exxon's expert, Brent Searcy of ETIC Engineering, Inc. ("ETIC"), cites to ETIC's own subsurface investigations to support these claims.  (Miguel Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. 7 (ETIC expert report) at 13).  These supporting documents are not in the record.

[6]    The depth below the surface at which groundwater was found at MW-1 varied between 34 feet and 38 feet.  (Miguel Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. 7 (ETIC expert report), Table 2).

occurred.  Exxon claims to have contacted New West in 2003 to
demand payment for additional contamination.  (Pl.'s SUF in Supp.
of Mot. for Summ. J. ¶ 32).  New West refused that demand.  (Id.
¶ 33).  Exxon claims the costs attributable to additional
contamination placed on the site by New West to be $750,021.
(Id. ¶ 34).

There is no evidence in the record showing a transfer
of interest in the gas station between NWP LP and New West
Petroleum, LLC ("NWP LLC") or between NWP and NWP LLC.
Nevertheless, on September 12, 2000, NWP LLC and Bains signed a
purchase and sale agreement in which NWP LLC agreed to transfer
ownership of the gas station to Bains.  (Moore Decl. in Supp. of
Summ. J. Ex. C).  Escrow did not close on that sale until April
2001.  (Moore Decl. in Supp. of Summ. J. ¶ 34)  The escrow
document in the record leads to further confusion about the
respective roles of the New West entities because it lists NWS
and NWP LP (and not NWP LLC) as the sellers of the gas station
and cross defendant Sartaj Singh Bains as the buyer.  (See Ramos
Decl. in Opp'n to Defs.' Mot for Summ. J. (Not Parties to the
Agreements) Ex. 4 (escrow closing docuement)).

On January 19, 2001, NWP LP assigned its interest in
the lease to Bains.  (Wong Decl. Ex. L (fourth amendment to
ground lease)).

J. Gilbert Moore is presently the sole owner and
operator of NWP, NWP LP, NWS, and NWP LLC.  (Exxon Separate SUF
in Opp'n to Defs.' Mot. for Summ. J. (Not Parties to the
Agreements) at ¶¶ 2-6)(citing Moore deposition testimony).  In
1998, Gilbert had a 50% stake in NWP LLC and NWP LP, and was the

managing and general partner of both NWP LLC and NWP LP.  (<u>Id.</u> at ¶¶ 3-4).

Exxon alleges ten causes of action against New West in the Second Amended Complaint ("SAC"): (1) breach of the purchase and sale agreement; (2) breach of the lease assignment; (3) breach of the implied covenant of good faith and fair dealing; (4) declaratory relief setting out the rights and duties of the parties; (5) express indemnity; (6) equitable indemnity; (7) violations of California Business and Professions Code § 17200 ("§ 17200") (8) violations of § 17200 predicated on California Health and Safety Code § 25296.10 ("HSC § 25296.10"); (9) violations of § 17200 predicated on California Water Code § 13260(a) ("WC § 13260(a)"); and (10) injunctive relief.

Defendants' countercomplaint and cross-complaint alleges causes of action against Exxon and Sartaj Singh Bains: (1) against Exxon, breach of contract; (2)  against Exxon, breach of the implied covenant of good faith and fair dealing; (3) against Exxon, express indemnification; (4) against Bains, express indemnification; (5) against Exxon and Bains, equitable indemnification; (6) against Exxon and Bains, declaratory relief for nonliability; and (7) against Exxon and Bains, violations of § 17200 predicated on violations of HSC § 25296.10.

Bains' countercomplaint against New West comprises five causes of action and his cross-complaint against Exxon comprises three.  Against New West, Bains alleges there are facts supporting: (1) express indemnity; (2) equitable indemnity; (3) declaratory judgment of nonliability; (4) violations of § 17200 predicated on HSC § 25296.10; (5) violations of § 17200

1  predicated on California Health and Safety Code § 25359.7.
2  Against Exxon, Bains alleges there are facts supporting: (1)
3  express indemnity; (2) equitable indemnity; and (3) a declaratory
4  judgment of nonliability.

5       Exxon alleges five causes of action against Bains in
6  its counterclaim: (1) express indemnity; (2) equitable indemnity;
7  (3) declaratory relief of rights and duties regarding liability;
8  (4) violations of § 17200 predicated on violations of HSC §
9  25296.10; (5) violations of § 17200 predicated on violations of
10  WC § 13260(a).

11  II. <u>Discussion</u>

12       A. <u>New West is Four Entities, Not One</u>

13       The first question the court must answer, and one that
14  bears on many of the motions discussed below, is whether NWP, NWP
15  LP, NWS, and NWP LLC are four entities or one.  The New West
16  entities have conducted themselves in a manner such that
17  interpretation of the various contracts at issue is an onerous
18  task.  NWP and Exxon entered into a purchase and sale agreement
19  in July 1998.  In September 1998, NWP LP began appearing on the
20  signature lines of amendments to the purchase and sale agreement
21  with Exxon, even though there was no novation nor any assignment.
22  Even more confusing, NWP LLC was purportedly the seller of the
23  gas station in the purchase and sale agreement with Bains in
24  September 2000.  New West has not presented any documents showing
25  that there was a transfer of interest between NWP LP and NWP LLC
26  or between NWP and NWP LLC.  On the April 2001 escrow document in
27  the record, NWP LP and NWS are listed as sellers and Bains as
28  buyer.  The inference to be drawn from these facts is that J.

1  Gilbert Moore, who has always controlled all four entities, does
2  not distinguish between these entities and forgets which entity
3  is which when entering into different contracts.

4          "Generally, alter ego liability is reserved for the
5  parent-subsidiary relationship.  However, under the single-
6  enterprise rule, liability can be found between sister
7  companies."  Las Palmas Assocs. v. Las Palmas Ctr. Assocs., 235
8  Cal. App. 3d 1220, 1249 (1992).  "In effect what happens is that
9  the court, for sufficient reason, [determines] that though there
10 are two or more personalities, there is but one enterprise; and
11 that this enterprise has been so handled that it should respond,
12 as a whole, for the debts of certain component elements of it."
13 Id.

14         Two conditions must be met before the alter ego
15 doctrine will be invoked.  First, there must be a unity of
16 ownership between a corporation and its equitable owner.  Second,
17 inequity must be the result if the alter ego doctrine is not
18 invoked.  Sonora Diamond Corp. v. Superior Court, 83 Cal. App.
19 4th 523, 538 (2000).

20         Although the interpretation of the contracts at issue
21 would be much simpler if the court were able to invoke the alter
22 ego doctrine, and although Moore has consistently confused his
23 New West entities, the court cannot invoke the alter ego doctrine
24 because there was not unity of ownership in the entities at the
25 time the purchase and sale agreement was entered between New West
26 and Exxon.  As Exxon concedes, in 1998, Moore had only a 50%
27 stake in NWP LLC and NWP LP, although he was the managing and
28 general partner of both of those entities.  (Exxon Separate SUF

9

1    in Opp'n to Defs.' Mot. for Summ. J. (Not Parties to the

2    Agreements) at ¶¶ 3-4).   There is nothing in the record showing

3    that Moore had less than a 100% interest in NWP and NWS at the

4    time of the purchase and sale agreement with Exxon.   Therefore,

5    there is no unity of ownership and the alter ego doctrine cannot

6    be invoked.

7        B. <u>New West's Motion to Amend Answer</u>

8            Defendants move to amend their answer to Exxon's

9    complaint "1) to clarify the second affirmative defense by citing

10   to specific section [sic] of the California Code of Civil

11   Procedure that governs statute of limitations,[7] and 2) to assert

12   a new affirmative defense numbered Twenty Three to allege that

13   Plaintiff fraudulently induced the defendants to enter into the

14   agreements."  (Defs.' Mot. for Leave to File Am. Answer at 3).

15   Not only do Defendants seek leave to amend their answer to add an

16   affirmative fraud defense, but they move for summary judgment on

17   those same grounds.[8]  (<u>See</u> Defs.' Mot for Summ. J. (Excuse of

18   Performance)).

19           Plaintiff filed its SAC in November 2004.   Defendants

20   filed their answer to the SAC, which they now seek to amend, in

21   December 2004.   The trial is scheduled for July 26, 2005.

22   _____

23       [7]    Defendants' second affirmative defense presently reads
     "As and for a Second affirmative defense to all causes of action
24   in the First Amended Complaint, these Defendants allege that
     Plaintiff's claims against these Defendants are barred by the
25   applicable statute of limitations."  (Defs.' Answer to SAC ¶ 67).

26       [8]    All defendants also move for summary judgment on the
     basis that performance is excused due to Exxon's breach of
27   warranty, an affirmative defense already found in defendants'
     answer at paragraph 73.   That argument for summary judgment is
28   addressed below.

1      In the pretrial scheduling order issued in April 2004,

2   the court ordered that "[n]o further joinder of parties or

3   amendments to pleadings is permitted except with leave of court,

4   good cause having been shown under Fed. R. Civ. P. 16(b)."

5   Plaintiff sought and received leave of the court to amend its

6   complaint for a second time in November 2004.  However, the order

7   prohibiting amendments to pleadings absent leave of the court

8   remained unaltered.

9      The governing standard in this case is not Federal Rule

10  of Civil Procedure 15(a), but Federal Rule of Civil Procedure

11  16(b) ("Rule 16(b)").  See Johnson v. Mammoth Recreations, Inc.

12  975 F.2d 604, 607-08 (9th Cir. 1992)(once district court has

13  issued a pretrial scheduling order pursuant to Rule 16

14  establishing a timetable for pleadings, Rule 16 controls).  An

15  order pursuant to Rule 16 "shall control the subsequent course of

16  action unless modified by a subsequent order."  Fed. R. Civ. P.

17  16(e).  "A scheduling order is not a frivolous piece of paper,

18  idly entered, which can be cavalierly disregarded by counsel

19  without peril."  Johnson, 975 F.2d at 610(citation omitted).

20     Defendants must show "good cause" under Rule 16(b) and

21  the pretrial scheduling order to be permitted to amend the

22  complaint.  The "good cause" standard primarily considers the

23  diligence of the party seeking the amendment.  Id. at 609.

24  "Carelessness is not compatible with a finding of diligence and

25  offers no reason for a grant of relief."  Id.

26     Defendants' good cause argument is as follows:

27     [T]hrough the depositions that have been recently taken in
       the case, including the deposition of Marla Guensler, an
28     Exxon employee taken on April 7, 2005, the Defendants have

discovered that there is no indication that Exxon ever
investigated the cause of the contamination that existed at
the property while Exxon operated the gas station, nor that
Exxon ever took any corrective action to fix or repair the
contamination. . . . Having just completed discovery of
Exxon's environmental engineer for the site on April 7,
2005, the Defendants have filed this motion at the first
opportunity available to them.

(Mot. for Leave to File First Am. Answer at 5).  Defendants are

not specific about what Guensler said that made them add their

affirmative defense.[9]  By the above quoted language, it appears

that all Guensler's deposition did for New West was confirm a

negative – that Exxon "[n]ever investigated the cause of the

contamination" and "[n]ever took any corrective action."  There

was no compelling reason why Guensler's deposition had to be

taken so late in the proceedings.  Moreover, Exxon argues

convincingly that Guensler's deposition testimony was merely

confirmation of the testimony of six other Exxon witnesses.

Further, defendants admit that the facts underlying the defense

have been available throughout discovery.  (Mot. for Leave to

File First Am. Answer at 6)(in arguing that the amendment will

not change the nature of the case, defendants admit that "[t]he

question of whether Exxon knew there was an ongoing discharge,

and the question of whether Exxon took steps to fix or repair the

cause of the contamination, has been asked repeatedly throughout

the discovery process.").  This admission is incompatible with a

finding of diligence.  See Johnson, 975 F.2d at 610.

_____

        [9]     Exxon, in its opposition to New West's motion to amend,
noted that New West did not inform the court what Ms. Guensler
said that made viable the affirmative defense New West seeks to
add.  Despite this being brought to New West's attention, New
West again fails in the reply brief to explain why Ms. Guensler's
deposition testimony was the lynchpin to this new defense.

1      Not only does plaintiff fail to show good cause for
2  their delay, but Exxon would be substantially and irreparably
3  prejudiced by a grant of permission to amend.  Plaintiff must be
4  permitted to challenge the pleading of fraud.  <u>See</u> Fed. R. Civ.
5  P. 9(b)("In <u>all</u> averments of fraud or mistake, the circumstances
6  constituting fraud or mistake shall be stated with
7  particularity.")(emphasis added).  The elements of defendants'
8  proposed fraud defense are not all contained in their other
9  defenses.  <u>See</u> <u>Filet Menu, Inc. v. C.C.L. & G., Inc.</u>, 79 Cal App.
10 4th 852, 859 (2000)(elements of fraud defense to contract are (1)
11 fraudulent misrepresentation of a (2) material fact (3) upon
12 which victim relies and (4) with intent to defraud).  Therefore,
13 Exxon would need to conduct additional discovery to prepare an
14 adequate rebuttal to defendants' defense, and the trial would
15 need to be substantially delayed.  (<u>See</u> Ramos 56(f) Decl. ¶
16 8)("If the fraud defense were presented during the discovery
17 period, Exxon Mobil would have performed discovery concerning the
18 specifics of New West's claims in order to prepare a proper
19 defense thereto.").

20      There is no motion before the court to modify the
21 scheduling order to allow Exxon to conduct discovery on this new
22 defense.[10]  What this appears to reflect is defendants' desire to
23 conduct a "trial by surprise."  This would subvert the purposes
24 of the discovery provisions in the Federal Rules of Civil
25 Procedure, <u>see</u> <u>Ruiz v. Hamburg-Am. Line</u>, 478 F.2d 29, 32 (9th

26

27      [10]    New West, in its reply brief on the issue of amendment,
   states that it "would be willing to consent to re-opening
28 discovery in the case on these limited matters."  (Defs.' Reply
   to Pl.'s Opp'n to Defs.' Mot. to Amend at 8).

1  Cir. 1973)(purposes of discovery devices "to reduce the amount of

2  litigation, to narrow the issues and to avoid surprises and to

3  promote justice")(citation omitted), as well as render the Rule

4  16(b) scheduling order a frivolous piece of paper.  See Johnson,

5  975 F.2d at 610.  The court refuses defendants' invitation to

6  reward this attempt.  The motion to amend is denied, and

7  therefore defendants' motion for summary judgment on the basis of

8  a fraud defense is also denied.[11]

9       C. Bains' Motion for Leave to File Amended Answer and

10 Counterclaims

11       Sartaj Singh Bains, perhaps prompted by New West's

12 motion to amend its answer, now also seeks to amend his answer to

13 New West's cross claim to assert a fraudulent inducement defense

14 and a defense alleging New West breached the covenant of good

15 faith and fair dealing.  Bains also seeks to amend his

16 counterclaim against New West to assert claims for "fraudulent

17 inducement, rescission, breach of the implied covenant of good

18 faith and fair dealing, and for a declaratory judgment of

19 invalidity of contract."  (Bains' Mem. in Opp'n to New West's

20 Mot. for Summ. J. at 3).  Like New West, Bains moves for summary

21 judgment on its claims of fraudulent inducement.

22       As a basis for the necessity of these amendments Bains

23 alleges that J. Gilbert Moore misrepresented to him that "Exxon

24 would fully remediate the petroleum hydrocarbon contamination at

25 _____

26      [11]     As for the motion to add a statutory statute of
   limitations provision to defendants' second affirmative defense,
   the court finds this amendment not necessary.  (See Defs.' Answer
27 to the SAC at 10)("these Defendants allege that Plaintiff's
   claims against these Defendants are barred by the applicable
28 statute of limitations")(emphasis added).

14

the Northgate Property." (Cross-def.'s Mem. in Supp. of Leave to Amend at 2-3). Bains argues in his papers that he has shown good cause to amend because he only discovered these alleged misrepresentations at the time of J. Gilbert Moore's deposition on March 31, 2005. However, at oral argument Bains' counsel conceded that the key document putting Bains on notice that Exxon was not solely liable for all contamination on the Property was the purchase and sale agreement between Exxon and NWP. Bains' counsel also conceded that Bains was provided a copy of this purchase and sale agreement in November 2004, six months before the present motion was made.

For the same reasons the court denies New West's motion to amend, the court also denies Bains' motion to amend. Bains has not shown any reasons why the amendments could not have been made earlier, and to allow the amendments at this very late stage would prejudice New West.

D. Summary Judgment Standard

The court must grant summary judgment to a moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party adverse to a motion for summary judgment may not simply deny generally the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Simply put, "a summary judgment motion cannot be defeated by relying solely

1  on conclusory allegations unsupported by factual data." <u>Taylor</u>

2  <u>v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).  The non-moving

3  party must show more than a mere "metaphysical doubt" as to the

4  material facts.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475

5  U.S. 574, 587 (1986).

6      E. <u>Motion for Summary Judgment of NWS and NWP</u>

7          The first summary judgment motion the court considers

8  is that of New West Stations, Inc. and New West Petroleum for

9  summary judgment regarding Exxon's claims against those entities.

10 NWS and NWP claim that they were not parties to the purchase and

11 sale agreement with Exxon and that they were similarly not

12 parties to the lease assignment.

13         In 1998 Exxon solicited bids only from existing Exxon

14 distributors, of which NWP was one.  (Moore Decl. in Supp. of

15 Summ. J. ¶ 2).  Gilbert declares that it was always his intention

16 to form a new entity to buy the gas station from Exxon, and that

17 Exxon knew of that intention.  (<u>Id.</u> ¶ 6).  Regardless of

18 Gilbert's intention, NWP LP could not have contracted to purchase

19 the gas station on July 6, 1998 because it did not yet exist.

20 <u>See</u> Cal. Civ. Code § 1558(essential to validity of a contract

21 that parties exist).  Further, NWP LP, even if it had been

22 formed, could not have bid on the gas station because it was not

23 then an Exxon distributor.  Before NWP LP was formed on July 22,

24 1998, NWP entered into a purchase and sale agreement with Exxon

25 on July 6, 1998.  (Miguel Decl. in Supp. of Pl.'s Mot. for Summ.

26 J. Ex. 3 (purchase and sale agreement)).

27         There was no assignment of interest in the gas station

28 from NWP to NWP LP.  (Exxon Response to Defs.' SUF in Supp. of

Mot. for Summ. J. ¶ 12).  Instead, NWP LP was simply named on
documents having to do with the sale beginning in September 1998.
(See Moore Decl. in Supp. of Summ. J. Ex. B (third amendment to
purchase and sale agreement)).  The bill of sale for the gas
station, executed on September 10, 1998, is signed by a
representative of Exxon and J. Gilbert Moore of NWP LP.  (Id. Ex.
E).  On September 29, 1998, Exxon assigned its lease of the
Property to NWP LP.  (Wong Decl. Ex. F).

       Thus, the court is presented with the question of with
which party Exxon contracted.  The resolution of a contractual
ambiguity is normally a question of law.  Garcia v. Truck Ins.
Exch., 36 Cal. 3d 426, 439 (1984)("It is solely a judicial
function to interpret a written contract unless the
interpretation turns upon the credibility of extrinsic
evidence.").  New West wants the court to consider extrinsic
evidence in the form of Moore's affidavit testimony that all
parties understood at the time the purchase and sale agreement
was executed that Exxon was only contracting with NWP until NWP
LP was formed.  This argument fails, because there is an
integration clause in the purchase and sale agreement stating
that

          [t]his Agreement and the attached exhibits are intended by
          the Parties to be the final, complete, and exclusive
          statement of the agreement.  There are no oral
          understandings . . . except as stated herein.  No amendment,
          addition, modification or waiver of any provision of this
          Agreement shall be effective unless it is in writing and is
          signed by both parties.

(Miguel Decl. Ex. 3 (purchase and sale agreement) ¶ 26).

       However, New West's other argument, that there was an
implicit novation in the third amendment to the purchase and sale

17

agreement and the bill of sale, requires closer attention.

"Novation is the substitution of a new obligation for an existing

one."  Cal. Civ. Code § 1530.  One form of novation is "the

substitution of a new debtor in place of the old one, with <u>intent

to release the latter.</u>"  Cal. Civ. Code § 1531(emphasis added).

Thus, Exxon must have intended to release NWP from all

obligations for a novation to have occurred.

        It is a "well established rule that the burden of

proving a novation is on the party asserting its existence, and

that the proof in support thereof must be clear and convincing."

<u>Ayoob v. Ayoob</u>, 74 Cal. App. 2d 236, 250 (1946)(citations

omitted).  The bill of sale and third amendment do not

demonstrate clearly and convincingly that Exxon intended to

release NWP from its contractual obligations under the purchase

and sale agreement.  The body of those documents do not mention

any novation or substitution of NWP LP for NWP.  The only

indication of a possible novation is contained in the signature

line, the significance of which an inattentive representative of

Exxon could have missed.  Such inattentiveness does not clearly

and convincingly indicate intent on the part of Exxon.  Were it

otherwise, there would be a strong incentive for an obligor like

New West to add or subtract an "L.P." or an "LLC" in the

signature line, hope that the representative of the obligee was

inattentive to the change, and thereby perhaps substitute an

insolvent entity for a solvent one by subterfuge.[12]  NWP and Exxon

were the parties to the purchase and sale of the gas station.

_____

        [12]   New West's counsel conceded at oral argument that there
may be some problems with the capitalization of NWP LP.

18

1  Therefore, NWP is not entitled to summary judgment as against

2  Exxon's claims.

3          The next question is whether NWS is entitled to summary

4  judgment.  In the final escrow statement printed on April 5,

5  2001, NWP LP and NWS are listed as sellers of the gas station and

6  Bains as the buyer.  (Ramos Decl. in Opp'n to Defs.' Mot for

7  Summ. J. (Not Parties to the Agreements) Ex. 4 at 7).  However,

8  merely being listed on the escrow agreement does not mean that

9  NWS has an ownership interest in the gas station to sell.  Exxon

10 has provided no other documents showing that NWS at any point

11 owned the gas station.  New West, on the other hand, provides the

12 reasonable explanation that NWS was merely the owner of the

13 liquor license.  Since the parties contracting for the gas

14 station were NWP and Exxon, and since all of Exxon's claims arise

15 out of the contract, NWS must be granted summary judgment.

16     F. New West's Motion for Summary Judgment On Exxon's Claims

17 on the Basis of Breach of Warranty

18         New West argues that, even if New West released

19 petroleum hydrocarbons (a point New West does not concede), that

20 release would be excused by Exxon's breach of an express

21 warranty.  The warranty to which New West refers is contained in

22 Exxon's assignment of the lease to NWP LP.  (See Wong Decl. Ex.

23 F).  In that document, Exxon warranted that "all Assignor's

24 [Exxon's] obligations [under the lease] have been fully

25 performed."  (Id. at 1).  At the time PNB assigned the lease to

26 Exxon, Exxon agreed to assume the duties of PNB under the lease.

27 (Id. Ex. E at 1).

28         New West argues that Exxon did not comply with

19

paragraphs 11 and 38 of the original lease.  Paragraph 11

requires the lessee to comply with "all the requirements of

Municipal and County, State and Federal authorities."  (Wong

Decl. Ex. A (ground lease)).  Paragraph 38 requires the lessee to

maintain underground gasoline storage tanks with secondary

containment and a continuous monitoring system.  (Id.).

New West claims that Exxon did not comply with the

requirements of government authorities, and that Exxon thus

breached its warranty to NWP LP that Exxon's obligations as a

lessee had been fulfilled.  For this proposition New West relies

on California Health and Safety Code § 25295:

> Any unauthorized release which escapes from secondary
> containment, or from primary containment, if no secondary
> containment exists, increases the hazard of fire or
> explosion, or causes any deterioration of the secondary
> containment of the underground tank system shall be reported
> by the owner or operator to the local agency designated
> pursuant to Section 25283 within 24 hours after the release
> has been detected or should have been detected.  A full
> written report shall be transmitted by the owner or operator
> of the underground tank system to the local agency within
> five working days of the occurrence of the release.  The
> report shall describe the nature and volume of the
> unauthorized release, any corrective or remedial actions
> undertaken, and any further corrective or remedial actions,
> including investigative actions, which will be needed to
> clean up the unauthorized release and abate the effects of
> the release and a time schedule for implementing these
> actions.

New West argues that the mere presence of MTBE in the

groundwater at a rate of 2,800 µg/L as of May 1998, when the

Delta initial subsurface investigation was conducted,

conclusively shows that there was an unauthorized release.  This

is not the law.

> For purposes of [the Underground Storage of Hazardous
> Substances] chapter, an unauthorized release includes, but
> is not limited to, a spill or overfill of a hazardous
> substance that meets both of the following conditions:

1     (1) The spill or overfill occurs while the hazardous substance is being placed in an underground storage tank.

2

3     (2) The spill or overfill is due to the use of improper equipment, faulty equipment, operator error, or inattention or overfilling.

4

Cal. Health & Safety Code § 25295.5 ("§ 25295.5").  New West

presents the "Underground Storage Tank Unauthorized Release

(Leak) / Contamination Site Report" filled out and signed by

Benjamin Heningburg of Delta on April 7, 1999 as evidence that an

"unauthorized release" occurred.  (Defs.' Mem. in Supp. of Summ.

J. Ex. G).  New West quotes deposition testimony from James

Brownell, employed by Delta as project manager for the initial

subsurface investigation report, in which Brownell states that

nobody at Exxon ever told him that they determined the cause of

the contamination at the Northgate site.  New West quotes

Heningburg to the same effect.  (Pls.' Mem. in Supp. of Summ. J.

(Excuse of Performance) at 23-24).

     This evidence is not enough for the court to determine

as a matter of law that an unauthorized release occurred and was

not reported.  It is possible that both Exxon and Heningburg

filed a report with the appropriate governmental agency, and

Exxon presents evidence that it sent the County of Sacramento

Environmental Management Department the Delta report on September

8, 1998.  New West has presented no evidence of any action taken

by any governmental agency against Exxon arising from any

"unauthorized release."  (See Pl.'s Opp'n to Defs. Mot for Summ.

J. (Excuse of Performance) at 5)(arguing that defendants accuse

plaintiffs of criminal and civil violations that would subject

Exxon to hundreds of thousands of dollars in penalties).  The

1  court concludes that it is an issue of material fact whether or

2  not Exxon complied with the appropriate reporting and remediation

3  requirements as it was required to do under the contract.

4  Therefore, the court cannot hold as a matter of law that Exxon

5  breached paragraph 11 of the lease assignment.  New West presents

6  no evidence that Exxon did not maintain underground gasoline

7  storage tanks with secondary containment and a continuous

8  monitoring system, and therefore the court cannot hold as a

9  matter of law that Exxon breached paragraph 38 of the lease

10  assignment.

11       Even if Exxon did not comply with the appropriate

12  reporting requirements, however, summary judgment for New West on

13  this ground would be inappropriate.  Exxon's breach of a warranty

14  included in the <u>assignment of lease</u> would not justify New West's

15  failure to perform under the <u>purchase and sale agreement</u>.  New

16  West has presented no evidence that these two contracts are in

17  reality one contract.  See <u>Karz v. Dep't of Prof'l and Vocational</u>

18  <u>Standards</u>, 11 Cal. App. 2d 554, 557 (1936)(contract to construct

19  building; owner's breach of separate, incidental agreement to pay

20  for extras held not ground for rescission of the first contract).

21  New West's motion for summary judgment on the basis of breach of

22  warranty must fail.

23       G. <u>New West's Motion for Summary Judgment on Bains' Claims</u>

24       The purchase and sale agreement entered into by NWP LLC

25  and Bains on September 12, 2000 contains, at paragraph 14, a

26  "disclaimer and release":

27       Disclaimer and Release: Buyer [Bains] hereby acknowledges
         that Seller [NWP LLC] has not conducted any review or
28       investigation of the properties; that Seller expressly

22

disclaims any warranty or representation by it or anyone or any party representing Seller; and that Buyer is relying solely on its own investigation as to the condition of the properties. Based on the fact that neither Seller, nor any of its agents, employees and/or other persons acting on Seller's behalf have made any representation or warranty of any kind in connection with any matter relating to the properties, Buyer, for itself and its successors, releases and forever discharges Seller, Seller's employees, and agents of and from all claims, actions, causes of actions, demands, rights damages, costs, expenses, liabilities, or compensation whatsoever.

(Bains Decl. Ex. 1).  New West moves for summary judgment on Bains' claims based on the contractual release from liability.

        Bains argues that the purchase and sale agreement expired because the November 30, 2000 modification of the agreement states that "[t]he September Agreement shall be extended to allow for closing of escrow up until December 12, 2000." (Bains' Mem. in Opp'n to New West's Mot. for Summ. J. at 9; see also Bains Decl. Ex. 2 (Nov. 2000 modification of purchase and sale agreement)).  Bains argues that, after December 12, 2000, there was no contract between Bains and any of the New West entities.  Bains points the court to the clause in the purchase and sale agreement stating that "[t]ime is of the essence in this agreement."  (Bains Decl. Ex. 1 ¶ 19).

        As a matter of law, NWP LLC had no ownership interest in the gas station.  New West has not shown any transfer of interest between NWP, the buyer of the gas station from Exxon, and NWP LLC.  However, NWP LLC made other promises in its purchase and sale agreement with Bains, and thus there was consideration on both sides of the contract. (See, e.g. Bains Decl. Ex. 1 (purchase and sale agreement) ¶ 7)("Buyer's Conditions," including NWP LLC's promises to apply best efforts

23

to extend the lease, to apply best efforts to assist Bains in becoming a Lotto vendor, and to not brand another gas station as a Chevron); <u>see also</u> Cal. Civ. Code § 1605(any benefit conferred upon the promisor is a good consideration for the promise).[13]

The court, therefore, must consider the effect of the "time of the essence" clause in regard to NWP LLC.  Bains argues that the terms of the contract are unknowable because the September 2000 agreement expired.  California courts apply equitable principles when a "time of the essence clause" will result in an excessive penalty or forfeiture.  <u>Call v. Alcan Pac. Co.</u>, 251 Cal. App. 2d 442, 447 (1967).  A minor detail like the date of the close of escrow should not automatically jettison the September 2000 agreement and render the terms of the agreement unknowable where the intent of the parties was to perform and the parties did perform to the extent of their ability to do so.[14] Reading the agreement to be one where the terms are unknowable would not only penalize the parties whose intent, from all indications, was to fulfill the September 2000 agreement, it would penalize the fact finder in this case whose duty it is to compare the terms of the contract and the parties' performance. No separate contract was made after escrow did not close in December 2000.  The court finds the disclaimer and release clause to still be in effect as to NWP LLC.  Therefore, NWP LLC is

---

[13]    Bains might argue that, since NWP LLC did not have authority to sell the gas station, NWP LLC perpetrated a fraud on Bains.  Fraud must be pleaded with particularity, however, and Bains did not plead fraud.

[14]    Indeed, NWP LLC performed <u>beyond</u> their ability to do so: the gas station was transferred to Bains' possession in April 2001.

1  entitled to summary judgment as against Bains' claims against it.

2

3      NWP LP is also entitled to summary judgment.  NWP LP

4  had no ownership interest in the gas station and did not execute

5  the purchase and sale agreement with Bains.

6      Bains may continue to pursue his claims against NWP.[15]

7  However, Bains may not continue to pursue his claims against NWP

8  on the basis of express indemnity.  New West points out that

9  there is not an indemnity clause in either the purchase and sale

10 agreement or the lease assignment.  Bains does not dispute this

11 reading.  (Cross-def.'s Mem. in Opp'n to Cross-Pls.' Mot. for

12 Summ. J. at 3)("The express indemnification claim against New

13 West is deleted").

14      H.  Exxon's Motion for Summary Judgment

15      Exxon moves for summary judgment on its breach of

16 contract claim on two grounds.  First, Exxon argues that the

17 initial subsurface report prepared by Delta in June 1998 provided

18 the contractual "baseline condition," and that, under the

19 purchase and sale agreement, Exxon is not responsible for

20 remediating any contamination beyond that present as of June

21 1998.  The relief Exxon seeks in this regard is a declaratory

22 judgment that New West is responsible for the heightened levels

23 of MTBE contamination, beginning in 1999, indicated in Exxon's

24 expert's report.  Exxon's second argument is that the purchase

25

26      [15]  New West might argue that the court's order today puts
   NWP in the shoes of NWP LLC, and thus that the disclaimer and
27 release should be effective against any claims made by Bains
   against NWP.  The court, however, refuses to reward NWP for its
28 sloppy bookkeeping.

and sale agreement provides that New West was required to
purchase environmental impairment insurance covering New West and
Exxon, that New West failed to acquire such insurance, and that
this lawsuit would not have been necessary had New West acquired
the insurance.

### 1. Exxon's Baseline Condition Argument

The July 6, 1998 purchase and sale agreement between
Exxon and NWP provides that "Exxon will undertake such
remediation of the Baseline Condition at [the] Property as is
required under applicable laws, regulations, or government orders
. . ." (Miguel Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. 3 ¶
12). "Baseline Condition" is defined in the same agreement as

> the level of petroleum hydrocarbon contamination (i)
> determined to be located on [the] Property prior to the
> Closing Date, (ii) caused by Exxon's operations on such
> Property, and (iii) required to be remediated under
> applicable federal, state or local laws and regulations, as
> such levels are established in the most recent written
> report setting forth the results of the Assessment or
> Additional Assessments of each Property, as applicable . . .

(Id. ¶ 11(b)).  The purchase and sale agreement states that both
NWP and Exxon have the right, but not the obligation, to conduct
environmental site assessments.  (Id. ¶¶ 11(a), 11(d)).

Exxon argues that the Delta initial subsurface
investigation report is representative of the baseline condition
of the subsurface soil and water.  There are no other written
reports regarding the environmental condition of the subsurface
soil and water other than the Delta report and the report of
Exxon's expert Brent Searcy.  New West's counsel was repeatedly
given the opportunity at oral argument to explain what J. Gilbert
Moore understood as the written report that would describe the

26

baseline condition if it was not the Delta report.  New West's counsel was unable to provide any explanation for why the Delta report was not the applicable written report, and instead argued, as he did in his papers, that no reasonable level of testing prior to the close of escrow would have established the baseline condition.  (See Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 12-14).  Such an interpretation would make a nullity of ¶ 11(b) of the purchase and sale agreement, which requires that the baseline condition be set out in the "most recent written report."

Furthermore, there is evidence in the record that J. Gilbert Moore tacitly accepted the Delta report as setting out the baseline condition.  By contract, New West had the opportunity to conduct its own testing.  (Miguel Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. 3 ¶ 11(d)).  New West did not do so.  New West could have objected to the findings of the Delta report, but chose not to do so until several years later, after subsequent reports showed a substantial increase in the amount of contamination and after Exxon was forced to sue for damages arising from that additional contamination.

Unfortunately for Exxon, however, the determination that the Delta report sets out the baseline condition does not end the inquiry into which party is responsible for the clean up of contamination over and above that set out in the baseline condition.  Under the contract, Exxon agreed to "undertake such remediation of the Baseline Condition at [the] Property as is required" under law.  (Miguel Decl. Ex. 3 (purchase and sale agreement) ¶ 12).  Therefore, Exxon is responsible for remediating the contamination represented in the Delta report.

27

1   The contract goes on to provide that "Exxon will not be

2   responsible for investigation or remediation of, or any costs

3   related to, petroleum hydrocarbons or other contamination

4   released or discharged on the Propert[y] after the Closing Date."

5   (Id. ¶ 12(d); see also id. ¶ 12(e)("Additional Contamination,"

6   the remediation of which NWP must pay for, defined as a release

7   or discharge of petroleum hydrocarbons after the closing date).

8   These clauses leave a significant contractual ambiguity as to

9   which party pays for contamination in two situations: 1) when

10   contamination was released prior to the Delta report, but had not

11   yet migrated to a physical point at which Delta was conducting

12   its measurments; and 2) when contamination was released after the

13   Delta report, but before the closing date.

14          To the extent there is an ambiguity in the contract, it

15   must be construed against Exxon as the drafter.  (See Malysiak

16   Decl. in Opp'n to Pl.'s Mot. for Summ. J. Ex. D (deposition of

17   Charles Vaughan) at 61)(Exxon uses standardized language

18   regarding the baseline condition in contracts with distributors);

19   Cal. Civ. Code § 1654(ambiguous terms to be construed against

20   drafter).  Therefore, the court construes the contract to require

21   Exxon to perform all required remediation of petroleum

22   hydrocarbons released before the closing date.  In the absence of

23   a contractual provision stating otherwise, the court finds this

24   to be an equitable interpretation of the contract, as it would

25   require each party to remediate the contamination that it caused.

26          There is a genuine issue about the rate at which

27   petroleum hydrocarbons, once released, enter the groundwater.

28   (Compare Miguel Decl. Ex. 7 (ETIC report) at 5(plaintiff's expert

concluding that impacts to groundwater from an underground

storage tank release would be observed quickly) <u>with</u> Malysiak

Decl. Ex. C-1 (rebuttal report of defendant's expert Gould) at

3("The modeling results, which [plaintiff's expert] Searcy uses

to support his claim of a rapid travel time, actually support our

claim of a longer travel time.")).[16]   Therefore, it is yet to be

determined what percentage of fault each party bears for the

contamination already remediated or yet to be remediated.

Furthermore, Exxon has failed to present evidence that no

releases occurred between the assessments conducted in the Delta

report and the closing date of September 29, 1998.   Therefore,

Exxon's motion for summary judgment on these grounds must fail.

                    2. <u>New West's Failure to Purchase Insurance</u>

           The purchase and sale agreement entered into by NWP and

Exxon contains a paragraph requiring NWP to acquire environmental

impact insurance:

> Purchaser [NWP] shall, concurrently with the Closing Date
> and until such time as Purchaser sells, assigns, or
> otherwise transfers all of Purchaser's interest in the
> Property, maintain in full force and effect the following
> insurance with companies satisfactory to Exxon:
>
> (a) Environmental Impairment Insurance Coverage with at
> least limits of One Million Dollars ($1,000,000.00) on a
> continuous and uninterrupted basis, solely at Purchaser's
> expense, insuring for environmental legal liabilities
> arising out of, or in any manner associated with, related
> to, or flowing from Purchaser's ownership of tanks or
> equipment or its use of or presence on the Property.

---

[16]     New West has also submitted documents that New West
claims prove that the underground storage tanks were not
releasing petroleum hydrocarbons.   (Moore Decl. in Opp'n to Pl.'s
Mot. for Summ. J. E's. C-1 to C-7 (tightness tests)).   The
documents do not clearly state that no releases were occurring,
and the parties offer no assistance in interpreting these
documents.   Therefore, the court does not rely on them at this
stage.

1  (Miguel Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. 3 ¶ 20).

2  The purchase and sale agreement requires that this insurance also

3  name Exxon as an additional insured.  (Id.).  New West admits

4  that no environmental impairment insurance was obtained.  Exxon

5  claims that if New West had complied with the contract and had

6  secured $1,000,000 in coverage, there would have been no need to

7  file the suit against New West.

8          Exxon's motion for summary judgment on this ground must

9  fail.  The contract provision only requires that New West obtain

10  insurance for "legal liabilities arising out of . . . [NWP's]

11  ownership of tanks or equipment or its use of or presence on the

12  Property."  As discussed above, there is a genuine dispute about

13  the extent to which each party is responsible for the release of

14  petroleum hydrocarbons.  New West was not required by the

15  contract to secure insurance for legal liabilities arising out of

16  Exxon's prior ownership of the property.[17]  Therefore, the failure

17

18          [17]   J. Gilbert Moore states that he attempted to secure
       environmental impairment insurance and failed because it is
19     impossible to acquire that type of insurance in California.
       (Moore Decl. in Opp'n to Pl.'s Mot. for Summ. J. ¶ 8).  Moore
20     claims that the reason for this is that California's "underground
       storage tank fund" provides coverage.  "A condition in a
21     contract, the fulfillment of which is impossible[,] . . . is
       void."  Cal. Civ. Code § 1441.
22          Exxon objects to New West's impossibility defense
       because it was not affirmatively pleaded, nor was Exxon made
23     aware of it until New West's opposition to Exxon's motion for
       summary judgment.  In its SAC, plaintiff alleges that "New West
24     failed to procure the insurance policies required under the
       Agreement."  (SAC ¶ 23).  New West summarily denies this
25     allegation in its answer, but nowhere in the answer claims that
       it was impossible to secure such insurance.  Impossibility must
26     be pleaded as an affirmative defense, McCalden v. Cal. Library
       Ass'n, 955 F.2d 1214, 1219 (9th Cir. 1990), and therefore Exxon's
27     argument in this regard has merit.  In addition, New West did not
       identify insurance agent James Peck in its Rule 26 disclosures.
28     In his declaration, Peck states that it was impossible to secure

1  of New West to secure insurance is not dispositive.

2         I. <u>Exxon's Motion for Sanctions Under Rule 26</u>

3  _____Exxon moves for sanctions against New West and New

4  West's attorney under Rule 26(g).  New West initially disclosed,

5  pursuant to Rule 26(a), that a Michael Sgourakis possessed

6  "information regarding the environmental condition of the subject

7  property at the time of purchase, as well as possible post-

8  purchase releases of petroleum hydrocarbons."  (Miguel Decl. in

9  Supp. of Mot. for Sanctions Ex. 1 (New West initial disclosures)

10  at 3).  New West does not dispute that Sgourakis did not have

11  that information.  (Defs.' Mem. in Opp'n to Pl.'s Mot. for

12  Sanctions; <u>see also</u> Miguel Decl. in Supp. of Mot. for Sanctions

13  Ex. 2 (Sgourakis deposition)).  Instead, New West first argues

14  that plaintiff knew that Sgourakis did not possess the relevant

15  information.  Second, New West argues that New West made

16  available Tom Landwehr on the same date and at the same time as

17  Sgourakis so that plaintiff's time spent in preparing for,

18  traveling to, and conducting Sgourakis' deposition would not have

19  been wasted if plaintiff's counsel had capitalized on the

20  opportunity to depose Landwehr then rather than later.

21         Rule 26(g)(3) states that

22

23

24  _____

25  environmental impact insurance in California.  This may or may
   not be true, but Exxon had no opportunity to depose Peck nor
26  conduct any other discovery on this newly minted defense.  New
   West's attempt to ambush Exxon must not be rewarded.
27  Nevertheless, for the reasons stated above, Exxon's motion for
   summary judgment based on New West's failure to secure
28  environmental impact insurance still fails.

31

> [i]f without substantial justification a certification[18] is
> made in violation of the rule, the court, upon motion or
> upon its own initiative, shall impose upon the person who
> made the certification . . . an appropriate sanction, which
> may include an order to pay the amount of the reasonable
> expenses incurred because of the violation, including a
> reasonable attorney's fee.

Rule 26(e)(1) states that

> [a] party is under a duty to supplement . . . its
> disclosures under subdivision (a) if the party learns that
> in some material respect the information disclosed is
> incomplete or incorrect and if the additional or corrective
> information has not otherwise been made known to the other
> parties during the discovery process or in writing.

Therefore, if New West learned that Sgourakis did not possess the

relevant information and did not correct its Rule 26(a)

disclosure regarding Sgourakis, and Exxon did not learn that the

disclosure was inaccurate from discovery or from New West, the

court <u>must</u> impose an appropriate sanction.

        New West submits two documents to support its argument

that Exxon knew that Sgourakis did not possess "information

regarding the environmental condition of the subject property at

the time of purchase, as well as possible post-purchase releases

of petroleum hydrocarbons."  First, New West submits a letter

signed by Landwehr, identifying Landwehr as an environmental

consultant, which New West claims was produced to Exxon before

Sgourakis' deposition.  Second, New West submits a page of

deposition testimony from J. Gilbert Moore in which Moore states

that Landwehr was "an environmental professional that assisted

---

[18]    "The signature of the attorney or party constitutes a
<u>certification</u> that to the best of the signer's knowledge,
information, and belief, formed after a reasonable inquiry, the
disclosure is complete and correct as of the time it is made."
Fed. R. Civ. P. 26(g)(1)(emphasis added).

1  [him] in the transaction." (Malysiak Decl. in Opp'n to Mot. for

2  Sanctions Exs. 1 and 2). These documents are not convincing.

3  Nowhere do these documents state that Landwehr is the <u>only</u>

4  environmental consultant on the job. Furthermore, the documents

5  leave open the possibility that Sgourakis was an environmental

6  consultant at some point in the past but is not now. New West

7  knew and Exxon did not know that Sgourakis did not possess the

8  information Exxon sought, and therefore New West's failure to

9  update its disclosures subjects New West to sanctions. New West

10  has presented no "substantial justification" for its

11  certification made in violation of Rule 26(a). <u>See</u> Fed. R. Civ.

12  P. 26(g)(3).

13      The next question regards the sanction this court

14  should impose. Exxon counsel Miguel claims that he spent 6 hours

15  preparing for, traveling to, and appearing at Sgourakis'

16  deposition. His standard hourly rate is $605 per hour. (Miguel

17  Decl. in Supp. of Sanctions ¶ 12). He also claims that airfare,

18  taxi, and court reporter costs were incurred in the amount of

19  $628.20. (<u>Id.</u> ¶ 11). The total sum Miguel requests is

20  $4,258.20. (<u>Id.</u> ¶ 13).

21      New West argues that Landwehr would have been a perfect

22  substitute for Sgourakis. That is not so. Landwehr may have

23  been "the environmental consultant who [] reviewed the

24  environmental reports submitted by Plaintiff to the Defendants in

25  this case," (Defs.' Mem. in Opp'n to Mot. for Sanctions at 2),

26  but there is no indication that he had "information regarding the

27  environmental condition of the subject property at the time of

28  purchase, as well as possible post-purchase releases of petroleum

33

1   hydrocarbons."  Thus, the information Landwehr possessed and the

2   information Exxon sought through the deposition of Sgourakis was

3   not identical.  Exxon's counsel had prepared to depose Sgourakis,

4   not Landwehr.  The fact that Landwehr was available does not

5   mitigate the expense that Exxon incurred.

6        New West next argues that $605 per hour is not an

7   appropriate sanction.  However, Exxon's counsel Miguel

8   represented in open court that he charges Exxon this amount and

9   Exxon pays him this amount.  New West has presented no evidence

10  to the contrary, nor has it presented any evidence that this

11  figure is disproportionate to the rates billed and collected by

12  other attorneys, whether locally or nationally, dealing in these

13  types of matters.  Therefore, the court awards Miguel the full

14  $4,258.20.

15      J. Exxon's Motion in Limine to Exclude Herb's Testimony

16           Hans Herb is a lawyer specializing in environmental

17  law.  (See Miguel Decl. in Supp. of Mot. to Exclude Herb

18  Testimony Ex. 1 (Herb letter report)).  New West disclosed Herb

19  as a testifying expert on March 11, 2005.  Exxon moves to exclude

20  Herb's testimony because his testimony is allegedly designed to

21  encroach on the duty and obligation of the court to instruct the

22  jury on the law.

23       The court's solution to this dispute is the following:

24  defendants' counsel will present to the court an offer of proof

25  comprising questions he will ask Herb and the answers he expects

26  Herb will give.  Exxon will then have an opportunity to make

27  objections to the answers of those questions on the basis of any

28  misstatements of law, irrelevance, or other grounds.  Defendants

                              34

1   will then have an opportunity to respond to Exxon's objections.

2   The dates for these submissions will be determined at the time of

3   the final Pretrial Conference.  The court will then determine at

4   the time of trial, before Herb is permitted to testify, whether

5   and to what extent he will be allowed to testify, and whether and

6   to what extent the court will instruct the jury as to the matters

7   upon which his testimony is proffered.

8       K. <u>Daubert Motions</u>

9           New West disclosed William Gould as a testifying expert

10  to Exxon in March 2005, and produced his report concerning the

11  time it takes for petroleum hydrocarbons to travel from an

12  underground storage tank on the Property to the groundwater.

13  Exxon argues that Gould's computer model is not reliable because

14  it has not been subject to peer review and because it is not

15  generally accepted in the scientific community.  New West makes

16  similar objections to the testimony of Exxon's expert, Brent

17  Searcy.

18          In <u>Daubert v. Merrell Dow Pharmaceuticals</u>, the Supreme

19  Court elaborated on Rule 702's requirement that an expert's

20  testimony be the "product of reliable principles and methods."

21  <u>See</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 145

22  (1999)(<u>Daubert</u> requires district court to serve as a "reliability

23  gatekeeper"); <u>Daubert</u>, 509 U.S. 579, 592-95 (1993).  The inquiry

24  under <u>Daubert</u> is flexible, and the <u>Daubert</u> factors are not meant

25  to serve as a definitive checklist or test.  509 U.S. at 593.

26          The four <u>Daubert</u> factors a district court should

27  consider in assessing the reliability of expert testimony

28  include: (1) whether the theory or technique can be tested to see

1  if it can be falsified; (2) whether the theory or technique has

2  been subjected to peer review and publication; (3) the potential

3  rate of error of the theory or technique; and (4) whether a

4  theory or technique is generally accepted in the relevant

5  scientific community.  Id. at 592-94.

6        As the court noted at oral argument on these motions, a

7  Daubert hearing and additional briefing is required so that the

8  court can fulfill its duty to serve as a reliability gatekeeper.

9  The pretrial conference for this case is scheduled for July 5,

10  2005.  Both parties are instructed to be prepared at that time to

11  suggest a briefing schedule on the Daubert motions, along with a

12  date or dates on which these motions can be heard.  Both experts,

13  along with any other witnesses the parties wish to call, should

14  be available on the dates set for the Daubert hearing.[19]

15        IT IS THEREFORE ORDERED that:

16        (1) Exxon's motion to strike be, and the same hereby

17  is, DENIED;

18        (2) New West's motion to amend its response to the

19  Second Amended Complaint be, and the same hereby is, DENIED;

20        (3) New West's motion for summary judgment on the

21  grounds that New West's performance was excused by Exxon's fraud

22  and misrepresentation be, and the same hereby is, DENIED;

23        (4) Bains' motion to amend his answer and counterclaim

24  against New West be, and the same hereby is, DENIED;

25

26        [19]   Exxon also filed objections to certain statements made
by Moore, Landwehr, and Wong.  Since the court does not rely on
27  these statements in this decision, Exxon's objections are
irrelevant at this stage.  Exxon may renew these objections
28  during the testimony of these witnesses at trial.

1    (5) Bains' motion for summary judgment against New West
2 be, and the same hereby is, DENIED;

3    (6) New West's motion for summary judgment as to all of
4 Exxon's claims against the New West entities on the basis of
5 breach of warranty be, and the same hereby is, DENIED;

6    (7) New West's motion for summary judgment as to all of
7 Exxon's claims against New West Stations, Inc. on the grounds
8 that New West Stations, Inc. was not party to the agreements be,
9 and the same hereby is, GRANTED;

10    (8) New West's motion for summary judgment as to all of
11 Exxon's claims against New West Petroleum on the grounds that New
12 West Petroleum was not party to the agreements be, and the same
13 hereby is, DENIED;

14    (9) New West's motion for summary judgment on Bains'
15 express indemnity claim against the New West entities be, and the
16 same hereby is, GRANTED;

17    (10) New West's motion for summary judgment on Bains'
18 claims other than his express indemnity claim be, and the same
19 hereby is, GRANTED as to Bains' claims against New West Petroleum
20 LLC and New West Petroleum L.P.;

21    (11) New West's motion for summary judgment on Bains'
22 claims other than his express indemnity claim be, and the same
23 hereby is, DENIED, as to Bains' claims against New West
24 Petroleum;

25    (12) Exxon's motion for summary judgment on its claims
26 against New West be, and the same hereby is, DENIED;

27    (13) Exxon's motion for sanctions against New West
28 pursuant to Rule 26(g)(3) be, and the same hereby is, GRANTED, in

37

1  the amount of $4,258.20;

2           (14) New West shall submit an offer of proof as to the

3  testimony of Hans Herb on or before June 20, 2005; Exxon shall

4  submit any objections to the offer of proof on or before June 27,

5  2005; New West shall submit any reply to Exxon objections on or

6  before July 5, 2005.

7           (15) counsel for the parties shall be prepared to set a

8  date or dates for Daubert hearings when they appear at the

9  pretrial conference on July 5, 2005 at 10:00 a.m.

10 DATED: June 6, 2005

11

12

13                        WILLIAM B. SHUBB
                          UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              38