UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

EXXON MOBIL CORPORATION,

NO. CIV. 03-2222 WBS EFB

      Plaintiff,

      v.

MEMORANDUM OF DECISION

NEW WEST PETROLEUM L.P., NEW
WEST PETROLEUM, L.L.C., NEW
WEST PETROLEUM, NEW WEST
STATIONS, INC., and NEW WEST
L.L.C.,

      Defendants,
_____/

AND RELATED THIRD-PARTY CLAIMS,
CROSSCLAIMS, AND COUNTERCLAIMS.
_____/

----oo0oo----

     This action involves disputes over which party is
contractually responsible under a Purchase and Sale Agreement
("Agreement") between plaintiff Exxon Mobil Corporation ("Exxon")
and defendants New West Petroleum, New West Petroleum L.P., and
New West Petroleum L.L.C. (collectively, "New West") for paying

1

1    the costs of cleaning up petroleum contamination at 3430

2    Northgate Boulevard in Sacramento, California ("Property").

3            On October 3, 2007, a month-long jury trial concluded

4    in mistrial when the jury was unable to reach a verdict.  The

5    parties subsequently waived their right to a second jury trial

6    and stipulated to adjudication by the court based upon the

7    existing record and post-trial briefing.  The court has reviewed

8    the parties post-trial briefing and heard two days of oral

9    arguments.  This memorandum constitutes the court's findings of

10   fact and conclusions of law pursuant to Federal Rule of Civil

11   Procedure 52(a).

12   I.   <u>Background</u>

13           Exxon, the holder of a ground lease in the Property

14   since December 1988, built and operated a retail gasoline service

15   station on the Property beginning in 1991 that sold unleaded

16   gasoline containing methyl tertiary butyl ether (MTBE).  On July

17   6, 1998, Exxon entered into the Agreement, therein assenting to

18   sell the service station to New West, whose own operation of the

19   station would include the continued sale of unleaded gasoline

20   with MTBE properties.  Shortly thereafter, Exxon also assigned

21   its lease interest in the Property to New West.  On January 19,

22   2001, New West sold the station and assigned its interest in the

23   lease to cross-plaintiff Sartaj Singh Bains.

24           Due to known releases of contaminants that occurred

25   while Exxon operated the Property, the Agreement attempted to

26   apportion the responsibility for required remediation efforts

27   between Exxon and New West.  (Trial Ex. at 37 ¶¶ 11-12.)  As the

28   Agreement required, Exxon began investigating the extent of the

                                    2

contamination in 1998 and subsequently implemented monitoring and remediation systems.  During its remediation efforts, Exxon's tests revealed increasing levels of MTBE, which gave rise to the disputes in this case.

The remaining claims in this action are as follows. Exxon's Second Amended Complaint contains eight claims against New West: (1) breach of the purchase and sale agreement; (2) breach of the implied covenant of good faith and fair dealing; (3) declaratory relief setting out the rights and duties of the parties; (4) express indemnity; (5) equitable indemnity; (6) violations of California Business and Professions Code section 17200 ("section 17200"); (7) violations of section 17200 predicated on California Health and Safety Code section 25296.10 ("section 25296.10"); and (8) violations of section 17200 predicated on California Water Code section 13260(a).

New West, in turn, asserts counterclaims and crossclaims against Exxon and Bains, respectively: (1) against Exxon, breach of contract; (2) against Exxon, breach of the implied covenant of good faith and fair dealing; (3) against Exxon, express indemnification; (4) against Exxon and Bains, equitable indemnification; (5) against Exxon, declaratory relief for nonliability; and (6) against Exxon, violations of section 17200 predicated on violations of section 25296.10.

Finally, Bains asserts a single equitable indemnity counterclaim against New West and crossclaim against Exxon for equitable indemnity.

II. <u>Discussion</u>

To prevail on its claim that New West breached the

3

Agreement and thus must reimburse Exxon for remediation expenses, Exxon has the burden of proving, by a preponderance of the evidence: (1) the existence and terms of the Agreement; (2) that Exxon performed its obligations under the Agreement or was excused from doing so; (3) that New West breached the Agreement by refusing to reimburse Exxon for its remediation of contamination on the Property that occurred after the date of the closing of escrow, September 18, 1998, (the "Closing Date"), (Trial Ex. 37 at ¶ 4), and that was not caused by Exxon; (4) that New West's breach caused the damages about which Exxon complains; and (5) the nature and extent of Exxon's damages.  Careau and Co. v. Sec. Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1388 (1990); Reichert v. Gen. Ins. Co. of Am., 68 Cal. 2d 822, 830 (1968); see also Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc., 520 F. Supp. 2d 1184, 1194 (C.D. Cal. 2007) ("Plaintiff has the burden at trial of proving all elements of its breach of contract claim.").

A.   Remediation Responsibility Under the Agreement

In the Agreement, the parties attempted to delineate responsibility for any contamination existing on the Property at the Closing Date and any contamination occurring after that date. To do so, the Agreement provided that Exxon would undertake "remediation of the Baseline Condition" at the Property as required under applicable laws, regulations, or government orders.  (Trial Ex. 37 at ¶ 12.)

The term "Baseline Condition" is ambiguous and confusing on its face.  The Agreement defines the Baseline Condition in paragraph 11(b) as follows:

4

> [T]he level of petroleum hydrocarbon contamination (i) determined to be located on a Property prior to the Closing Date, (ii) caused by Exxon's operations on such Property, and (iii) required to be remediated under applicable federal, state or local laws and regulations, as such levels are established in the most recent written report setting forth the results of the Assessment or Additional Assessments for each Property, as applicable, as such levels may be reduced by Exxon's . . . remediation activities.

(Id. at ¶ 11(b).)  The court finds from a reading of the Agreement as a whole, and from the testimony, that the parties intended the word "level" in this definition to refer to the "amount" or "quantity" of contamination, rather than its situation, configuration, or density.

The court finds from the evidence that "the most recent written report setting forth the results of the Assessment or Additional Assessments for [the] Property" in the context of the above paragraph refers to the Initial Subsurface Investigation Report dated June 26, 1998 ("Delta Report").

The Agreement went on to provide that "Exxon will not be responsible for investigation or remediation of, or any cost related to, petroleum hydrocarbons or other contamination released or discharged on the [Property] after the Closing Date []."  (Id. at ¶ 12(d); see also id. at ¶ 12(e)(i) ("If Exxon causes the Additional Contamination as a result of its access to the Property, Exxon shall be responsible for the full cost of the cleanup of the Additional Contamination.").)

Thus, the court finds from the evidence that the parties contemplated that the costs of remediating the amount of contamination determined by the Delta Report to be located on the Property prior to the Closing Date would be borne ultimately by

1   Exxon, but that the costs to remediate any contamination released

2   or discharged thereafter, or not caused by Exxon's operations,

3   would be borne ultimately by New West.

4          The starting point in resolving the parties' dispute,

5   therefore, must be to determine what the the Baseline Condition

6   of the Property was.  Paragraph 11(b) of the Agreement

7   specifically required that the Delta Report, and any other

8   written assessment reports, "delineate the amount and location of

9   any petroleum hydrocarbons" that Exxon discovered as a result of

10  the assessment.  (Id. at ¶ 11(b).)  The problem is that no matter

11  how carefully the Delta Report is read, it is impossible to

12  determine the amount of petroleum hydrocarbons that existed.  The

13  Delta Report indicated that MTBE "was reported in the soil

14  samples collected from [a single monitoring well] at

15  concentrations ranging from 280 mg/kg to 7,800 mg/kg" and that

16  the "concentration" of MTBE in the groundwater "was reported at

17  2,800" parts per billion.[1]  (Trial Ex. 39 at 6.)

18         Because the parts per billion ratio used in the Delta

19  Report reveals only the concentration of MTBE that existed in the

20  test samples, it does not indicate the actual volume of MTBE that

21  was in the soil or the mass of MTBE that was in the groundwater

22  on the date of the tests.  (Trial Trs. Sept. 14, 2007 39:12-22,

23  Sept. 11, 2007 80:12-14.)  A concentration measurement is also

24  misleading in that it can change when there is an increase or

25

26         [1]    The Delta Report actually lists the concentration in
    terms of micrograms per liter (μg/L), which several witnesses
27  testified is synonymous with parts per billion and milligrams per
    kilogram.  (E.g., Trial Tr. Sept. 7, 2007 103:12-24, 144:17-21.)
28  The court will refer to the ratio as parts per billion.

                                    6

decrease in the volume of groundwater at the test site even if
the amount of MTBE remains the same. (Trial Tr. Sept. 7, 2007
146:10-18.)  Consequently, the Delta Report's reliance on
concentrations renders it impossible for the trier of fact to
quantify the contamination that existed. (Trial Trs. Sept. 11,
2007 80:12-81:5, Sept. 18, 2007 55:5-13; see also Trial Trs.
Sept. 7, 2007 118:8-119:9, Sept. 11, 2007 47:7-9 (indicating
that, as of the date of trial, Exxon had yet to determine the
extent of contamination at the Property).)

Not only does the data in the Delta Report fail to
establish the "amount" of MTBE as of the Closing Date, the
concentration measurements do not allow the court to make the
calculations that the Agreement contemplates.  Specifically,
without the ability to identify the Baseline Condition, the court
cannot quantify the amount of contamination Exxon caused prior to
the Closing Date and, more importantly, the amount of
contamination, if any, that was subsequently released on the
Property.[2]

---

[2]    The court recognizes that New West had the opportunity,
and was encouraged by Exxon to, perform its own testing and
terminate the Agreement if the results were unsatisfactory.
(Trial Ex. 37 at ¶¶ 7, 11(a), (c), (d).)  With the Fourth
Amendment to the Agreement, New West also had the opportunity to
modify the Baseline Condition based on the results of its own
tests.  (Trial Ex. 42.)  Nonetheless, New West's lack of
diligence does not diminish the importance of determining the
Baseline Condition.  Exxon, the drafter of the Agreement,
provided for the establishment of the Baseline Condition to limit
its own liability and cannot rely on its failure to fulfill the
obligation it reserved for itself.  See San Bernardino Valley
Water Dev. Co. v. San Bernardino Valley Mun. Water Dist., 236
Cal. App. 2d 238, 265 (1965) ("'Each party to a contract has a
duty to do what the contract presupposes he will do to accomplish
its purpose.'  Thus, 'A party who prevents fulfillment of a
condition of his own obligation . . . cannot rely on such
condition to defeat his liability.'" (citations omitted)

1    Even if the court could decipher a meaningful Baseline
2    Condition from the Delta Report, the court is not persuaded that
3    any purported Baseline Condition was not subsequently modified
4    pursuant to paragraph 11(b).  (See Trial Ex. 37 at ¶ 11(b) ("If
5    further assessment or remediation of petroleum hydrocarbons is
6    required by the Governmental Authority, the Baseline Condition of
7    [the] Property shall be modified as appropriate based on the
8    results of such additional assessments and remediation if caused
9    by Exxon's operations.").)  For example, on October 5, 2004, the
10   Environmental Management Department for the County of Sacramento
11   ("County") mandated that Exxon install at least two additional
12   monitoring wells, (Trial Ex. 4), and one of Exxon's project
13   managers for the Property testified that monitoring wells five,
14   eight, nine, ten, and eleven were installed to comply with
15   directives from the County.  (Trial Tr. Sept. 14, 2007 16:25-
16   17:4; see also Trial Tr. Sept. 18, 2007 57:3-10.)  For reasons
17   discussed in more detail below, Exxon has not proven, by a
18   preponderance of the evidence, that it did not cause the
19   contamination identified in the post-closing assessments.

20        B.   Breach of the Agreement and Damages
21             1.   Additional Contamination
22        While Exxon presented evidence of increased levels of
23   MTBE detected at the Property, Exxon did not show by a
24   preponderance of the evidence that these increases were not a
25   result of the contamination Exxon had originally caused prior to
26   the Closing Date; nor did Exxon show that the increases were
27   _____
28   (omission in original).

8

caused by the operations of New West or Bains.   After listening to all of the testimony and reviewing the trial exhibits, the court remains unpersuaded that additional contamination of the Property occurred after the Closing Date.   This does not mean that the court finds additional contamination did not occur; it means only that Exxon has not met its burden of proof.

Exxon does not dispute that MTBE contamination occurred while it operated the Property, (Exxon's Opp'n to New West's Post-Trial Br. 13:8-10), and credible evidence was presented at trial that the Property's elevated levels of MTBE contamination were a residual result of Exxon's prior operations.   For example, New West presented evidence that there was sufficient MTBE in the soil moisture in May 1998 to account for all of the MTBE reported through 2004.   (Trial Tr. Sept. 26, 2007 40:21-42:14, 47:15-19.) New West also presented evidence that the increased levels of MTBE reported after the transfer were from the build-up of MTBE concentrations from a release or releases during Exxon's operations and not from new post-closing releases.   (Trial Tr. Sept. 25, 2007 117:24-121:20, 132:18-22.)

Exxon never investigated the source of the contamination at the Property.   (Trial Tr. Sept. 7, 2007 138:16-139:19.)   Exxon's expert, Brent Searcy, testified that it is difficult, if not impossible, to know what type of releases occurred at the Property.   (Trial Tr. Sept. 18, 2007 73:24-74:24.)   Searcy also stated that his computer modeling method was not designed to determine how the MTBE was released into the soil, as his modeling begins with the assumption that the mass of MTBE is already in the soil.   (Trial Tr. Sept. 20, 2007 6:7-7:2.)

Exxon's consultant responsible for remediating the Property, Ted Moise, also testified that Exxon rarely knows what caused contamination in the first place. (Trial Tr. Sept. 11, 2007 35:6-14.)  This evidence alone makes it difficult to find that it is more likely than not that Exxon was not the cause of any additional contamination.

In an effort to show that either New West or Bains caused additional releases, Searcy testified that it was his opinion that there were three distinct instances of increased concentration of MTBE reported in the groundwater that resulted from post-closing unauthorized releases of petroleum. (Trial Tr. Sept. 14, 2007 135:22-136:18.)  These "peaks" or "spikes" were detected on April 5, 2000, April 2, 2002,[3] and January 29, 2004. (Trial Tr. Sept. 14, 2007 124:13-129:4; Trial Ex. 1 at tbl. 2; Trial Ex. 232 at tbl. 2.)

Based on the spikes and his computer module tests, Searcy opined that it would have taken MTBE forty days to travel from the point of release to the groundwater where it was detected. (Trial Trs. Sept. 14, 2007 125:21-126:19, 147:9-15, Sept. 18, 2007 11:6-12:3, 84:12-20.)  According to his tests, the vast majority of the MTBE would have moved through the soil to

---

[3]   As to the second alleged "peak" in 2002, there was evidence that the increase in the MTBE concentration detected was due to a decrease in the volume of groundwater beneath the monitoring well. (Trial Tr. Sept. 7, 2007 151:5-152:16; Trial Ex. 233 at tbl. 2 (stating that a "[g]rab sample [was] collected due to insufficient water; well may have purged dry and not recovered").)  Thus, a showing that MTBE concentration in the groundwater had increased is not tantamount to a showing of a new volume of MTBE entering the system from a new release, as the reduction of water volume may have lead to an increase in concentration. (Trial Tr. Sept. 7, 2007 145:15-146:18.)

1   the groundwater within this time-frame, leaving only a relatively

2   low fraction remaining in the soil. (Trial Tr. Sept. 18, 2007

3   12:4-13:4.)   Exxon contends that these "spikes" preclude a

4   finding that the contamination was caused by Exxon prior to the

5   Closing Date.   (Trial Tr. Sept. 14, 2007 135:22-136:12; Exxon's

6   Post-Trial Br. 6:3-12, 19:19-20, 25:3-5.)

7           Weighing against Searcy's theory, however, is the fact

8   that MTBE was no longer used in gasoline sold at the Property by

9   October of 2003, (Trial Trs. Sept. 18, 2007 88:10-12, Sept. 25,

10  2007 55:16-56:3), and increased MTBE concentrations at the site

11  showed up more than eight months after MTBE stopped being used at

12  the station and again, in December 2004, approximately fifteen

13  months after Bains stopped selling gasoline containing MTBE.[4]

14  (Trial Ex. 233 at tbl.2; Trial Tr. Sept. 25, 2007 56:15-22.)

15  Under Searcy's theory, any MTBE contamination should have

16  migrated to the groundwater within forty days, thus, the

17  detection of "spikes" of MTBE in December 2004 underscores the

18  unreliability of Searcy's testimony.[5]

19  _____

20      [4]   The December 2004 samples revealed MTBE contamination
    in the soil a few feet in depth, as well as ethanol contamination
21  in the pea gravel. (Trial Ex. 81; Trial Tr. Sept. 25, 2007 56:4-
    22, 73:25-74:7; see also Trial Tr. Sept. 25, 2007 77:13-78:3
22  (Bains had the MTBE-contaminated soil excavated and disposed of
    offsite).)   The presence of ethanol is not indicative of a
23  release of MTBE because ethanol was used to replace MTBE. (Trial
    Tr. Sept. 11, 2007 133:7-18.)   Exxon also did not establish that
24  the presence of ethanol changed the remediation requirements for
    the Property or required Exxon to incur additional damages.
25  (Trial Tr. Sept. 11, 2007 55:18-56:24, 164:1-10, 168:13-169:18;
    Bains' Opp'n to New West's Post-Trial Br. 17:3-5.)
26      [5]   Further, the "error rate" for the test used by Exxon in
    detecting the MTBE concentration is ten to twenty percent.
27  (Trial Tr. Sept. 18, 2007 67:18-22, 68:9-73:5.)   Given this error
    rate, the difference between the values that Exxon used to
28  quantify each of the reported "spikes" of MTBE contamination

1    The concentrations of MTBE also continued to increase
2    during the time that the station was closed while New West was
3    installing new equipment. (Trial Tr. Sept. 20, 2007 125:1-134:4,
4    Trial Ex. 233 at tbl. 2.) Just as Exxon has not explained how
5    MTBE was still being detected long after Bains stopped selling
6    fuel containing MTBE, Exxon has not explained how the
7    concentrations of MTBE were increasing while the Property was
8    closed during the installation of new equipment.

9    Credible evidence was also presented that both New West
10   and Bains took measures to prevent and detect releases during
11   their operation of the Property.  For example, New West upgraded
12   the equipment at the service station and installed new
13   dispensers, new under-dispenser containment boxes, and new
14   monitoring equipment. (Trial Exs. 210, 259; Trial Tr. Sept. 25,
15   2007 18:3-22:17.) All of New West's equipment tested tight and
16   passed a Tracer Test, which is designed to detect leaks. (Trial
17   Exs. 50, 78; Trial Trs. Sept. 20, 2007 142:19-145:16, Sept. 25,
18   2007 22:21-23:9, 25:3-10.) No releases were ever reported during
19   New West's operation of the service station and no alarms ever
20   sounded. (Trial Trs. Sept. 20, 2007 138:20-140:25, Sept. 21,
21   2007 32:5-10.) Even Searcy admitted that the magnitude of a
22   release necessary to result in the increased MTBE levels detected
23   would have triggered the monitoring systems' alarms. (Trial Tr.
24   Sept. 20, 2007 9:10-15.) Bains also had a system in place
25   designed to detect a release, (Trial Tr. Sept. 25, 2007 68:13-
26   24), and he kept track of gasoline quantities on a daily basis to
27
28   could have been much smaller than what Exxon claims.

12

1  ensure that the amount in the tanks matched the amount that had

2  been dispensed to customers.  (Trial Tr. Sept. 25, 2007 72:16-

3  73:2.)  Like New West, Bains installed new equipment intended to

4  increase the reliability of leak prevention and there were no

5  reported releases during his operation of the Property.  (Trial

6  Tr. Sept. 25, 2007 63:7-20, 71:21-72:6.)

7          As the parties agree, determining how and when a

8  contaminant was released into the ground is a difficult and often

9  impossible task.  This case presented the court with conflicting

10  evidence, none of which answers all the questions.  In the end,

11  however, the inconsistencies inherent in Exxon's theories

12  convince this court that the possibilities tip in favor of New

13  West's explanations.  See Metro. Stevedore Co. v. Rambo, 521 U.S.

14  121, 137 (1997) (explaining that under the preponderance

15  standard, the party bearing the burden of proof loses if the

16  evidence is evenly balanced).  Exxon, therefore, has failed to

17  satisfy its burden to prove, by a preponderance of the evidence,

18  that a post-Closing Date release occurred and that Exxon did not

19  cause the increased levels of contamination.

20          2.   Damages

21          Because Exxon has not proved that it did not cause the

22  increased levels of contamination, it is not entitled to damages.

23  See Mann v. Jackson, 141 Cal. App. 2d 6, 14 (1956) (noting that

24  where "no breach of the contract could have been claimed . . . no

25  damages could have been awarded"); see also Milton v. Hudson

26  Sales Corp., 152 Cal. App. 2d 418, 434 (1957) ("Uncertainty as to

27  the fact of damage, that is, as to the nature, existence or cause

28  of the damages, is fatal.").

13

1    Even if Exxon were able to prove a breach of the
2    Agreement and the causation of damages, Exxon still has not
3    carried its burden with respect to the calculation of such
4    damages.  See San Diego Hous. Com v. Indus. Indem. Co., 68 Cal.
5    App. 4th 526, 537 (1998) ("The plaintiffs have the burden of
6    proving by a preponderance of the evidence all of the facts
7    necessary to establish 'breach of contract' [including] the
8    amount of the damages.").  The court recognizes that, "once the
9    cause and existence of damages have been . . . established,
10   recovery will not be denied because the damages are difficult of
11   ascertainment."  Mardirossian & Assocs., Inc. v. Ersoff, 153 Cal.
12   App. 4th 257, 269 (2007).  Nonetheless, California law still
13   "requires that some reasonable basis of computation be used" in
14   the measurement damages.  Milton, 152 Cal. App. 2d at 434; see
15   also Ross v. Frank W. Dunne Co., 119 Cal. App. 2d 690, 701 (1953)
16   (finding that damages "must not be based on pure speculation or
17   conjecture").

18        Assuming Exxon had established that it did not cause an
19   ascertainable share of the increased levels of contamination,
20   paragraph 12(e) provides the method of calculating damages based
21   on New West's obligation to reimburse Exxon for Exxon's continued
22   remediation efforts.  (Trial Ex. 37 at ¶ 12(e).)  Specifically,
23   the Agreement provides that New West's fractional cost is
24   calculated based on the following formula:

25       Purchaser's fractional cost = 1 - (A divided by B)
         A = Estimated cost to complete remediation prior to
26       Additional Contamination;
         B = Estimated cost to complete remediation after
27       Additional Contamination.
         Example:
28       Estimated cost to complete remediation prior to

14

1    Additional Contamination $100,000 (calculated at the time
     of Additional Contamination).
2    Estimated cost to complete remediation after Additional
     Contamination $150,000 (includes the $100,000 plus
3    $50,000 in estimated costs related to Additional
     Contamination).
4    Purchaser's fractional cost equals: 1 - (A divided by B),
     or 1 - .667.  Purchaser will pay one-third (.333) of
5    remediation costs incurred after the Additional
     Contamination occurs.
6

7    (Id. at ¶ 12(e)(ii).)  To prove its damages, therefore, Exxon had

8    to provide sufficient evidence for the trier of fact to

9    differentiate between the costs incurred due to Exxon's existing

10   responsibility and New West's subsequent responsibility.

11        Exxon currently forecasts that it will spend $1.5

12   million in assessment, monitoring, and remediation efforts for

13   the Property, but that only $540,000 of that amount constitutes

14   the cost it would have incurred to remediate the 2,800 parts per

15   billion of MTBE identified in the Delta Report.  (Trial Trs.

16   Sept. 14, 2007 36:5-9, Sept. 18, 2007 94:16-18, Sept. 20, 2007

17   4:2-17.)  As the court found above, however, Exxon did not prove

18   that its responsibility is limited to that concentration of

19   contamination.[6]  Moreover, even if the court could discern an

20   amount of contamination attributable to New West without the

21        [6]    Exxon also bases its $540,000 calculation on the
22   premise that, prior to the discovery of increased levels of
     contamination, it planned to remediate the 2,800 parts per
23   billion of MTBE with natural attenuation, which is much less
     expensive than a groundwater extraction system.  The court is
24   unpersuaded, however, that Exxon ever had a concrete plan to
     remediate through natural attenuation.  (See, e.g., Trial Trs.
25   Sept. 7, 2007 139:20-22, Sept. 11, 2007 171:1-8 (Exxon's project
     manager and environmental consultant never discussed the
26   possibility of natural attenuation with the County), Sept. 7,
     2007 140:20-141:6 (Exxon never performed the tests that would
27   have determined whether natural attenuation was occurring), Sept.
     11, 2007 32:8-22, 156:5-14 (Exxon's environmental consultant
28   explained that he assumed active remediation would be required
     and never began drafting a remediation plan until early 2003).

1  Delta Report, Exxon's evidence of damages lacks a reasonable

2  basis to distinguish which costs resulted from existing

3  contamination and which were added due to subsequent releases

4  that Exxon did not cause.

5       To quantify its assessment, monitoring, and remediation

6  costs, Exxon submitted a two-page document that summarily lists

7  the costs incurred and projected between 2000 and 2010.  (Trial

8  Ex. 73.)  From this document, and the limited testimony of

9  Exxon's witnesses, the court cannot reasonably differentiate

10 between costs incurred to monitor the site, assess the extent of

11 contamination, or remediate specific quantities of contamination.

12 (See Trial Tr. Sept. 18, 2007 59:18-60:15 (Exxon's expert was

13 unaware how much Exxon spent to comply with the County's

14 directives to do additional assessments regarding the extent of

15 the contamination and estimated that Exxon spent only about

16 $200,000 for the installation of the groundwater extraction

17 system); see also Trial Trs. Sept. 18, 2007 56:12-57:2 (Exxon's

18 expert explained that the calculations were "based on our--

19 experience," but did not offer evidence about costs incurred for

20 comparable remediation efforts), Sept. 11, 2007 57:6-25 (an Exxon

21 project manager described the budgeting process as reviewing the

22 data and budgeting for "what you feel the future would be for

23 this site").)

24      Therefore, even if Exxon was entitled to reimbursement

25 from New West for the costs to remediate a subsequent release,

26 Exxon has failed to carry its burden of apportioning--or

27 providing the trier of fact with a method to apportion--the costs

28 attributable to each party.  See Coprich v. Superior Court, 80

1  Cal. App. 4th 1081, 1092 (2000) ("Plaintiffs bear the burden to
2  establish damages resulting from the alleged breach.").

3       C.   Remaining Claims

4            The failure of Exxon's breach of contract claim against
5  New West effectively extinguishes its additional claims for
6  breach of the implied covenant of good faith and fair dealing,
7  express indemnity, declaratory relief, and violations of
8  California Business and Professions Code section 17200
9  (predicated on California's Health and Safety Code section
10 25296.10 and Water Code section 13260(a)).  Specifically, each of
11 these claims rely on Exxon's above-addressed allegations that
12 there was an additional release of contamination that Exxon did
13 not cause, triggering New West's contractual obligation to either
14 remediate such contamination itself or proportionately reimburse
15 Exxon's remedial efforts.

16           Likewise, equitable indemnity would be inappropriate
17 here.  There are two forms of equitable indemnity that might
18 apply in this type of action.  "Implied contractual indemnity" is
19 premised upon the indemnitor's breach of duty owed to the
20 indemnitee to perform its contractual duties properly.  Sehulster
21 Tunnels/Pre-Con v. Traylor Bros., Inc./Obayashi Corp., 111 Cal.
22 App. 4th 1328, 1350 (2003).  Alternatively, "tort-based
23 indemnity" stems from a duty of due care to an injured party and
24 usually involves a breach of that duty, and thus only applies
25 when the indemnitor and indemnitee are jointly and severally
26 liable to an injured third party (here, the government).  W.
27 Steamship Lines, Inc. v. San Pedro Peninsula Hosp., 8 Cal. 4th
28 100, 116 (1994).  Under either form, a given party's liability

17

1  for equitable indemnity is based on, and apportioned by, its

2  proportional share of responsibility for the damages.  Bay Dev.,

3  Ltd. v. Superior Court, 50 Cal. 3d 1012, 1030-31 (1990).

4          Exxon contends that equitable indemnification is

5  appropriate in the instant matter because it has "satisfied more

6  than its share" of the damages and thus "is now entitled to a

7  proportionate contribution from New West." (Exxon's Post-Trial

8  Br. 30:25-31:1.)  Exxon is not entitled to implied contractual

9  indemnity because Exxon and New West "expressly contracted with

10 respect to the duty to indemnify, [thus] the extent of the duty

11 must be determined from the contract and not by reliance on the

12 independent doctrine of equitable indemnity." Rossmoor

13 Sanitation, Inc. v. Plylon, Inc., 13 Cal. 3d 622, 628 (1975).

14         Even if Exxon proved that there was a post-Closing Date

15 release that it did not cause and the court determined that

16 equitable considerations justified application of tort-based

17 equitable indemnity, Exxon has not provided sufficient evidence

18 to prevail on such a claim.  Specifically, because Exxon has not

19 carried its "stringent burden" in showing a reasonable or

20 practical division of damages entitling it to equitable

21 apportionment among joint-tortfeasors, O'Neil v. Picillo, 883

22 F.2d 176, 183 (1st Cir. 1989), the court "should not hasten to

23 'split the difference' in an attempt to achieve equity" or

24 "settle on a compromise amount that they think best approximates

25 the relative responsibility of the parties." United States v.

26 Atchison, Topeka & Santa Fe Ry. Co., Nos. 92-5068, 96-6226,

27 96-6228, 2003 WL 25518047, at *84 (E.D. Cal. July 15, 2003)

28 (citation omitted).  Rather, "'[i]n such circumstances, courts

1  lacking a reasonable basis for dividing causation should avoid
2  apportionment altogether.'"  Id. (citation omitted); see also
3  United States v. Burlington N. & Santa Fe Ry. Co., 520 F.3d 918,
4  945-46 (9th Cir. 2008) ("Apportionment is the exception,
5  available only in those circumstances in which adequate records
6  were kept and the harm is meaningfully divisible."); FMC Corp. v.
7  Vendo Co., 196 F. Supp. 2d 1023, 1034 (E.D. Cal. 2002)
8  (recognizing that, because "[p]roving divisibility is a 'very
9  difficult proposition,'" courts are "caution[ed] against making
10 an 'arbitrary apportionment for its own sake'").

11        Similarly, in light of the court's determination on
12 Exxon's claims against New West, New West's counterclaims against
13 Exxon and crossclaim against Bains are moot.

14        Bains' remaining claims for equitable indemnity,
15 alleged against New West and Exxon, also lack viability.  Because
16 Bains' contract and assignment with New West contains its own
17 purportedly valid and applicable express indemnification
18 provisions, the court cannot rely on implied contractual
19 indemnity.  Rossmoor Sanitation, Inc. v. Plylon, Inc., 13 Cal. 3d
20 622, 628 (1975) ("[Where] the parties have expressly contracted
21 with respect to the duty to indemnify, the extent of the duty
22 must be determined from the contract and not by reliance on the
23 independent doctrine of equitable indemnity.").  Nor can Bains
24 rely on implied contractual indemnity to support his claim
25 against Exxon because Bains did not have a contractual
26 relationship with Exxon.  With respect to tort-based equitable
27 indemnity, Bains did not persuade this court that equitable
28 considerations justify the court in providing greater protection

                                  19

1   than Bains had bargained for in his contract with New West.

2          IT IS THEREFORE ORDERED that each of the parties take

3   nothing on their respective claims, counterclaims, and

4   crossclaims enumerated in this Order.

5          The Clerk of the Court is directed to enter judgment

6   accordingly.

7   DATED:   July 15, 2008

8

9   _____

10  WILLIAM B. SHUBB
    UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28